UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MATTHEW M. CARSON,

                              Petitioner,         Case # 16-CV-688-FPG

v.                                                 DECISION AND ORDER

SUPERINTENDENT OF ELMIRA
CORRECTIONAL FACILITY,

                              Respondent.
_____

## INTRODUCTION

*Pro se* Petitioner Matthew Carson filed a Writ of Habeas Corpus Petition under 28 U.S.C. § 2254. He challenges the constitutionality of his custody pursuant to a judgment entered in state court wherein he was sentenced to concurrent terms of imprisonment of 25 years to life for a murder conviction and 15 years determinate plus five years of post-release supervision for two weapons charges. ECF No. 1 ¶¶ 1-5; ECF No. 10-3 at 217-18.

Petitioner claims that: (1) the evidence to support the jury's verdict was legally insufficient due to unreliable identification testimony; (2) the trial court failed to suppress two eyewitnesses' testimony as unduly suggestive; (3) the trial court failed to administer the oath of truthfulness to potential jurors; (4) he was not present at a particular sidebar conference; and (5) he received ineffective assistance of counsel. ECF No. 1 at 6-7, 10-28. Respondent opposes the Petition. ECF Nos. 9, 10.

## BACKGROUND

On April 21, 2009, a grand jury indicted Petitioner in connection with the homicide of Christopher Rogers of one count of murder in the second degree and two counts of criminal possession of a weapon. T. at 1-3 (April 23, 2009).[1]

### I.   *Wade* **Hearing**

The crux of the case against Petitioner and primary issue raised in this Petition is the eyewitness identification of Petitioner by two eyewitnesses, Janice Brown and Carolyn Monsees. Petitioner moved to suppress their out-of-court identifications and the court conducted a *Wade* Hearing. *See United States v. Wade*, 388 U.S. 28 (1967); WH at 1-42. Homicide Investigator Gary Galetta was the sole witness at the hearing. Galetta conducted an identification procedure with Brown on April 6, 2009. He told her that he would show her some photographs and wanted her to look at them individually and tell him if she recognized anyone. The array contained six photographs. WH at 11-12.

Galleta first showed Brown a black-and-white array. She indicated that the complexions of the individuals did not appear "all that telling" and she was having "some difficulty." *Id.* at 14, 26, 29-31. Galetta explained that he had a color photo array that "may be able to better depict some of the complexions" but that the flash can also alter an individual's complexion. *Id.* at 14. Galleta showed Brown the colored array, which contained photographs of the same individuals as the black-and-white array. Brown reviewed the array for about 30-60 seconds, selected photograph number two, and said: "this one is the best." *Id.* at 15-16, 28. Photograph number two was of Petitioner. *Id.* at 15-16.

---

[1] "T." with a date proceeding it refers to a proceeding conducted on the date indicated in the parentheses (ECF No. 10-3); "WH" refers to the transcript of the *Wade* Hearing conducted on October 5, 2009 (ECF No. 10-3 at 212-53); "TT" refers to the Trial Transcript dated July 20-26, 2010 (ECF Nos. 10-3 at 274-488; ECF No. 10-4 at 1-198); and "SR" refers to the state court record (ECF No. 10-2).

About fifteen minutes after the interview with Brown, Galetta conducted an identification procedure with Monsees. Galleta instructed her to look at some photographs that may or may not depict the individual involved in the incident and to tell him if she recognized anyone. WH at 17-18, 32-33. Galleta showed Monsees the colored array and after about 15-30 seconds she pointed to photograph number four and stated: "that's him." *Id.* at 18-19, 33-34. Petitioner's photograph number had been switched to number four for Monsees's interview. *Id.* at 34.

After Galetta's testimony, the parties provided closing remarks. *Id.* at 36-38. Petitioner's counsel argued that the court can see "readily there's a very distinct difference between the five photographs that are not [Petitioner] and the one photograph that is his." *Id.* at 36. Brown testified that she could not "distinguish" between the photographs and was having difficulty because of the individuals' complexions. *Id.* The prosecution argued that the photographs do not have to be "twins" and were not unduly suggestive. *Id.* at 37.

The trial court denied the motion, finding Galetta's testimony "credible and believable" and that there was "nothing unduly suggestive about the arrays or the procedures in which they were displayed to the witnesses." *Id.* at 38-39.

## II. Trial

### A. Prosecution

At the final pretrial conference, the trial court expressly advised Petitioner that he had the right to approach the bench for sidebar conferences. The court stated that it would not invite Petitioner to come up to the bench each time and if he did not approach then the court would consider it a waiver of his right to participate in that sidebar. T. at 4-5 (July 15, 2010). Petitioner acknowledged that he understood the waiver. *Id.* at 5. The court also advised Petitioner that he "could change [his] mind at any time[]" and could skip one conference and participate in the next,

and Petitioner indicated that he understood. *Id.* Petitioner and his counsel were presented with a "Waiver of Right to be Present During Sidebar Discussions," which Petitioner executed. *Id.*

Petitioner's jury trial began on July 20, 2010. TT at 1-598. On March 24, 2009, the victim, Christopher Rogers, and another man, Anthony Lott, were returning to Rogers's home from a store when they passed a black male approximately 18-19 years old, five-foot eight to five-foot nine in height, and wearing a hoody. TT at 281-84. Rogers and the black male exchanged words and the black male pulled a gun on Rogers. *Id.* at 285-89. The black male then backed up and ran away. Lott did not get a good view of him. *Id.* at 300, 308-10.

Rogers and Lott went back to the store a few minutes later and when they left the same man crossed the street towards them. They ran back to Rogers's house and as Lott reached the front door the man began shooting. Lott heard three shots. Rogers fell and got back up and Lott helped him inside. Rogers said "I'm hit. Call the cops." *Id.* at 293-97. Police and paramedics arrived but Rogers was unresponsive and could not be resuscitated. *Id.* at 260-63. An autopsy concluded that Rogers died of a gunshot wound to the back. TT at 44-45.

Brown and Monsees were working at a YMCA across the street from Rogers's house and the store at the time of the shooting. *Id.* at 283-84. Brown saw three men—two of them wore leather jackets and one wore a black hoody. *Id.* at 287, 289-90. The man with the black hoody had a "chrome, silver-colored gun" on his left side. *Id.* at 290.

Brown described everything as quiet until the man with the rusty leather coat said: "[i]f you come to shoot me, shoot me." *Id.* at 292, 294. At this time, Brown went to her car to find her cell phone but was too nervous and pushed the OnStar button and called for 9-1-1. *Id.* at 294. She described the man with the gun to the 9-1-1 operator as a "male black, 18 to 19 years old, wearing

4

a black hoody, [five]-foot eight to [five]-foot nine?" *Id.* at 344-45. Then she saw the man with the gun back away and run off. *Id.* at 294, 296.

Brown went back into the YMCA but returned to her car a few minutes later and used OnStar again to call 9-1-1 to check on the police response. *Id.* at 300-02, 351-52. At this time, she saw the men with the leather jackets walking toward a house and the man with the hoody running toward them before he fired three shots. *Id.* at 303. The hood had blown off the shooter's face. *Id.* at 298, 304. After he fired the three shots, he turned and Brown locked eyes with him for what "seemed like forever but it was a probably a split second." *Id.* at 303-04. The man put his hood back on and "took off." *Id.* at 298, 304.

On the day of the shooting, Brown told Investigator Galetta that the shooter was "five-eight to five-ten, 19 years old, very thin, short hair with possible twists, with medium to light complexion." *Id.* at 358. Brown also testified that the victim was "a big guy" and that the shooter had "a fairer complexion" than the victim." *Id.* at 297.

Brown testified that she met with Galetta a few weeks after the shooting to look at photos. *Id.* at 362. She recognized Petitioner from the photo array within a "few seconds." *Id.* at 362-63. Brown also testified that she mentioned the shooter's complexion to Galetta because it "came up" and she was "trying to explain away the other five." *Id.* at 364, 366. Brown identified Petitioner in court as the shooter and testified that she was "100%" sure it was him. *Id.* at 297-98, 378.

Monsees testified that she was a teacher at the YMCA the morning of the shooting. *Id.* at 387. Around 11:15 a.m., she heard: "[a]re you going to f---ing do it" and saw "two gentlemen standing side by side, and another holding a gun up to them." *Id.* at 387-88, 392, 412. She testified that there was one man in a red leather jacket, one man in a black leather jacket, and one man in black hoody. *Id.* at 393. When she looked up, she "saw the full face of the man with the gun."

5

*Id.* at 394. Monsees and the shooter made eye contact and she saw his whole face. *Id.* at 394-95, 397.

After she ran in the building, an assistant who had called 9-1-1 handed her the phone. *Id.* at 400. She told the 9-1-1 operator that she did not know what the shooter was wearing, but that she knew he was wearing a hoody. TT at 412, 415-16, 423-26, 431-32. After she hung up the phone, Monsees saw the men with the leather coats but they eventually went out of her sight. TT at 404-05. She heard someone say, "there he is, that's the guy." *Id.* at 406. She then saw Petitioner walking quickly and heard gunshots. *Id.* at 406-07. Monsees testified that she could not see Petitioner's full face, only his profile, but was "absolutely" certain it was the same person she saw earlier because they "stared at each other in the face." *Id.* at 408.

After the shooting, Monsees described the shooter as a black male, five-foot eight, very thin, with a light complexion. *Id.* at 429-31. She identified Petitioner in court as the man with the gun. TT at 396-97. Petitioner was arrested in Cleveland, Ohio on April 14, 2009. *Id.* 380-83.

### B. The Defense

Petitioner's mother testified that Petitioner had "chin hair and a mustache" since he was about 15 years old. TT at 464-465. Investigator Galetta testified about the description Brown had given to him the day of the shooting and the out-of-court identification procedure he conducted. Galetta testified that Brown described the shooter as approximately five-eight to five-ten, 19 years old, and wearing a black hoody. Brown pointed out the thinness of the shooter and said his hair was "short knotty." *Id.* at 470. After Galetta showed Brown the black-and-white array, she indicated after 20 to 30 seconds that photograph number two was "probably familiar." *Id.* at 471. Brown commented about the complexion of the individuals and Galetta told her there was a color array that "may better depict skin tones or complexion." *Id.* at 475. She looked at the color array

6

for about 20-30 seconds and pointed to number two, stating: "this one is the best" and "none of the others come close." *Id.* at 475-76.

Investigator Salvatore spoke with Monsees on the day of the shooting and she described the shooter as "a black male in his 20s, approximately five-foot eight inches, thin build, clean shaven, light complexion, wearing a dark hoody with a light-colored emblem on the left arm near the shoulder, and dark pants." *Id.* at 502.

Petitioner's girlfriend also testified. She was shown photographs taken in February 2009 and stated that they accurately depicted Petitioner's facial hair at that time. *Id.* at 475-87. She testified that she and Petitioner went to Cleveland on April 1 for a vacation and that, before he was arrested, she did not know that he had any contact with the police. *Id.* at 488-94.

Petitioner testified in his own defense and denied knowing Rogers, being at the scene of the crime on March 24, 2009, and shooting Rogers. *Id.* at 503. On that day he recalled going by his mother's house around 9:00 a.m. to take her to work but she was gone already. He stayed at his mother's house with his older son "for awhile" but could not specifically state where he was around 11:30 a.m. that day. *Id.* at 504-05, 510-11. He went to Cleveland on April 1 with his girlfriend and two sons. *Id.* at 504-06. He had no contact with the police until he was arrested. *Id.* at 506-07.

## III. Direct Appeal

Petitioner filed a direct appeal to the Appellate Division, Fourth Department. His appellate counsel raised the following claims: (1) the jury's verdict rested on unreliable identification testimony and was therefore against the weight of the evidence; (2) the trial court erroneously denied Petitioner's motion to suppress the identification testimony; (3) ineffective assistance of

trial counsel; (4) prospective jurors were not sworn under oath before jury selection; and (5) the trial court improperly excluded Petitioner from a sidebar conference. SR at 1-33.

The Appellate Division affirmed Petitioner's convictions. *People v. Carson*, 126 A.D.3d 1537 (4th Dep't 2015). It concluded that the verdict was not against the weight of the evidence and that "any discrepancies between the [Petitioner's] appearance and the eyewitness testimony at trial presented mere credibility issues for the jury." *Id.* at 1537-38. The Appellate Division also concluded that Petitioner "knowingly, intelligently and voluntary waived" his right to be present at sidebar conferences and that defense counsel provided "meaningful representation." *Id.* at 1538. The Appellate Division held that Petitioner did not preserve for its review his contentions that (1) the photo array procedure was unduly suggestive or (2) prospective jurors were not given the requisite oath.

Petitioner's counseled letter application for a certificate granting leave to appeal to the New York State Court of Appeals raised four issues: (1) the Appellate Division misapplied the law when rejecting the weight of the evidence contention; (2) ineffective assistance of counsel; (3) the prospective jurors were not provided the requisite oath; and (4) Petitioner was excluded from a material stage in the proceedings when he was not present a sidebar conference. SR at 168-73. The Court of Appeals denied the application for leave to appeal on August 20, 2015. *People v. Carson*, 26 N.Y.3d 927 (2015).

## DISCUSSION

### I. Standard of Review

When a state court has adjudicated a claim raised in a petition for a writ of habeas corpus on the merits, the federal court must apply the deferential standard set forth in 28 U.S.C. § 2254(d). To prevail under § 2254, a petitioner must demonstrate that the state court's adjudication of his

8

federal constitutional claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court precedent or was based on an unreasonable factual determination in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d)(1), (2); *see also Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule but applied it in an unreasonable manner to the facts. *Williams*, 529 U.S. at 413. The question for a federal habeas court is whether the state court's application of the applicable law was "objectively unreasonable." *See id.* at 408-10; *see also Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015); *Eze v. Senkowski*, 321 F.3d 110, 125 (2d Cir. 2003).

"[A] determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir. 2003) ("The presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."). A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## II. The Petition

### A. Legally Insufficient Evidence

Petitioner argues that the jury's verdict rested on "unreliable" eyewitness identification testimony and was therefore insufficient to establish his guilt. The Appellate Division concluded that the verdict was not against the weight of the evidence and that "any discrepancies between

9

[Petitioner's] appearance and the eyewitness testimony at trial presented mere credibility issues for the jury." *Carson*, 126 A.D.3d at 1537-38.

Sufficiency of the evidence claims "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Jackson*, 566 U.S. 650, 651 (2012). First, "evidence is sufficient to support a conviction [on direct appeal] whenever, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Second, a "state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the decision was objectively unreasonable." *Id.*

A reviewing court "must consider all of the evidence admitted by the trial court, regardless of whether that evidence was admitted erroneously." *McDaniel v. Brown*, 558 U.S. 120, 131 (2010). The evidence must also be viewed "in the light most favorable to the prosecution," *id.* at 134, and the reviewing court "must defer to the jury's assessment of the weight of the evidence and the credibility of the witnesses." *DiCarlo v. Goord*, No. 03 CV 8336(KTD), 2006 WL 3714446, at *3 (S.D.N.Y. Dec. 13, 2006) (citation omitted). Based on the dual layers of deference owed on this claim, the Court concludes that the jury rationally credited Brown and Monsees's testimony that Petitioner was the shooter, and that the Appellate Division's determination of this claim was not objectively unreasonable. Accordingly, this claim is denied.

### B. Suppression of Brown's Out-of-Court Eyewitness Identification

Petitioner claims that Brown's eyewitness identification should have been suppressed because it was unreliable. ECF No. 1 at 19. Specifically, Petitioner argues that he was the only individual in the photo array with a narrow face. *Id.*

The Appellate Division concluded that Petitioner failed to preserve his contention that the photo array was unduly suggestive because he did not make that argument at the *Wade* Hearing. *Carson*, 126 A.D.3d at 1538 (citations omitted). The Appellate Division declined to exercise its discretion to review this contention in the interest of justice. *Id.*

"A federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Beard v. Kindler*, 558 U.S. 53, 55 (2009) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). In New York, failure to preserve an issue for appellate review is an independent and adequate state ground that will preclude federal habeas review of the claim. *See Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir. 1995). Thus, Petitioner's claim is barred.

If the federal court determines that a claim is procedurally barred, it may not review the claim on the merits unless the petitioner can show cause for the default and prejudice resulting therefrom, or if he can demonstrate that the failure to address the claim will result in a miscarriage of justice. *Coleman*, 501 U.S. at 750 (citations omitted). "A miscarriage of justice is demonstrated in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent." *Delston v. New York*, No. 07-CV-4373 (JFB), 2010 WL 3004591, at *6 (E.D.N.Y. July 29, 2010) (citation omitted).

Petitioner has not demonstrated cause or prejudice. While Petitioner continually asserts his innocence, he has not presented the Court with "new, reliable evidence establishing that he is factually innocent, and that it is 'more likely than not that no reasonable juror would have convicted him in light of the new evidence.'" *Morgan v. Lee*, No. 1:11-CV-0390 (MAT), 2012

WL 5336167, *6 (W.D.N.Y. Oct. 26, 2012) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Accordingly, the Court cannot review this claim.[2]

### C. Ineffective Assistance of Counsel

Petitioner argues that his attorney failed to highlight "dispositive and significant weaknesses" in the prosecution's case. ECF No. 1 at 22. Petitioner cites numerous examples that he believes constitute ineffective assistance of counsel. ECF No. 1 at 22-25.

To establish ineffective assistance of counsel in violation of the Sixth Amendment, Petitioner must establish that (1) his attorney's performance was deficient and (2) this deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Deficiency is measured by an objective standard of reasonableness, and prejudice is demonstrated by a showing of a 'reasonable probability' that, but for counsel's unprofessional errors, the result of the trial would have been different." *Washington v. Zon*, No. 04-CV-6351 (MAT), 2009 WL 2982977, at *4 (W.D.N.Y. Sept. 14, 2009) (citation omitted).

When a federal court reviews a state court determination under § 2254, "[t]he question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quotation marks and citation omitted). The *Strickland* and § 2254 standards are "highly deferential and when the two apply in tandem, review is doubly so." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citations and quotation marks omitted). "The question is whether there is any reasonable argument that counsel satisfied

---

[2] Furthermore, as Respondent points out, this claim fails for two other reasons. ECF No. 9 at 14-17. First, because Petitioner's leave letter did not raise or argue the suggestiveness claim, it is not exhausted. *See Jordan v. Lefevre*, 206 F.3d 196, 198-99 (2d Cir. 2000). Second, the Court agrees that the trial court's determination to deny suppression was not contrary to, or an unreasonable application of, clearly established law. *See Allen v. New York*, No. 07-CV-0023 (MAT), 2010 WL 811715, at *3 (W.D.N.Y. Mar. 1, 2010) (discussing due process requirements of identification testimony).

*Strickland's* deferential standard." *Id.* "This is a difficult to meet and highly deferential standard for evaluating state-court rulings." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quotation marks and citations omitted).

Having reviewed the Appellate Division's decision and based on the highly deferential standard applicable under § 2254 and *Strickland*, the Court concludes that the Appellate Division's determination of this claim was not contrary to, or an unreasonable application of, *Strickland*. Accordingly, Petitioner's ineffective assistance of counsel claim must be denied.

### D. Oath for Prospective Jurors

Petitioner claims that the trial court conducted jury selection without giving prospective jurors the oath of truthfulness pursuant to New York Criminal Procedure Law § 270.15(1)(a). ECF No. 1 at 26. Respondent asserts that this claim is barred from federal habeas review because the Appellate Division rejected it on an independent and adequate state ground and, in any event, it is not cognizable because it is based solely on an error of state law. ECF No. 9 at 19-21.

Section 270.15(1)(a) provides, in relevant part, that after being directed to the jury box, the prospective jurors "shall be immediately sworn to answer truthfully questions asked them relative to their qualifications to serve as jurors in the action." N.Y. Crim. P. L. § 270.15(1)(a). The Appellate Division rejected Petition's contention because he did not preserve it for review. *Carson*, 126 A.D.3d at 1538. This claim is therefore barred from this Court's review because the Appellate Division rejected it on an independent and adequate state ground and there is no basis to excuse the procedural bar. New York's preservation requirement is a firmly established and regularly followed procedural rule, *see Glenn*, 98 F.3d at 724, and has been applied to reject claims based on the failure to submit the oath of truthfulness to prospective jurors. *See, e.g.*, *People v.*

*Lyons*, 94 A.D.3d 1010 (2d Dep't 2012); *People v. Schrock*, 73 A.D.3d 1429, 1432 (4th Dep't 2010). Accordingly, this claim is denied.[3]

### E. Presence at Sidebar Conferences

Before trial, Petitioner expressly waived his right to be present at sidebar conferences and executed a signed waiver to that effect. T. at 4-5 (July 15, 2010). During jury selection, a sidebar conference occurred with a potential juror regarding her potential prejudice to serve as a juror and she was excused upon consent. Petitioner did not attend this conference, and he claims that he had the right to do so and that his waiver was not knowingly and intelligently made. ECF No. 1 at 27.

The Court is not persuaded. First, on the merits, Petitioner knowingly, voluntarily, and intelligently waived his right to be present at sidebar conferences and the right is one of state law and not cognizable on federal habeas review. *See, e.g.*, *Davis v. Graham*, No. 06-CV-0659T, 2010 WL 597960, at *9 (W.D.N.Y. Feb. 17, 2010). Second, Petitioner failed to exhaust this claim insofar as he presented it as a state claim under *People v. Antommarchi*, 80 N.Y.2d 247 (1992) and not a federal claim. *See id.* (citations omitted). Accordingly, Petitioner's claim must fail.

### CONCLUSION

For all the reasons stated, the Petition is DISMISSED and the Clerk of Court will close this case. Because Petitioner failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability will issue. *See* 28 U.S.C. § 2253(c)(2). The Court also certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this judgment would not be taken in good

---

[3] Even if the Court were to review this claim and find that the oath was not administered, it would nonetheless be denied because it is based solely on an error of state law and thus is not cognizable on federal habeas corpus review. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law.") (quotation marks and citations omitted)); *see also Hernandez v. Larkin*, No. 12 Civ. 8090 (AJN)/(SN), 2013 WL 4453316, at *21 (S.D.N.Y. Aug. 19, 2013); *Booker v. LaValley*, No. 10CV1105 (RGK), 2013 WL 528573, at *9 (N.D.N.Y. Feb. 11, 2013) (collecting cases).

faith and therefore denies leave to appeal as a poor person. *Coppedge v. United States*, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within 30 days of the date of judgment in this action. Petitioner should direct requests to proceed on appeal as a poor person to the United States Court of Appeals for the Second Circuit on motion in accordance with Federal Rule of Appellate Procedure 24.

IT IS SO ORDERED.

Dated: June 27, 2019
      Rochester, New York

                                        _____
                                        HON. FRANK P. GERACI, JR.
                                        Chief Judge
                                        United States District Court